**Dr. Ina BRADEN, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**The UNIVERSITY OF PITTSBURGH and Wesley W. Posvar, Defendants.**

**Civ. A. No. 71–646.**

United States District Court,
W. D. Pennsylvania.
March 13, 1975.

---

Sylvia Roberts, Baton Rouge, La., and David Berger, Philadelphia, Pa., for Braden.

Charles C. Arensberg, Pittsburgh, Pa., for University of Pittsburgh.

## MEMORANDUM

SORG, District Judge.

Dr. Ina Braden, plaintiff in the above entitled action, seeks damages and injunctive relief against the University of Pittsburgh (Pitt) and its Chancellor, Wesley W. Posvar, alleging injury as a result of discriminatory employment practice on the basis of sex. The alleged injury having occurred prior to the 1972 Amendment which rendered the Equal Employment Opportunities Act of 1964 applicable to private educational institutions, 42 U.S.C.A. § 2000e–1, plaintiff predicates jurisdiction on 28 U.S.C.A. § 1343 and the Civil Rights Act of 1871, 42 U.S.C.A. § 1983.[1] The defendants

1. "The district court shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . . . To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." 28 U.S.C.A. § 1343(3).

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C.A. § 1983.

have moved to dismiss, presenting a single dispositive issue: Did Pitt perform the challenged activity "under color of state law," and, therefore, subject to the "equal protection" clause of the Fourteenth Amendment to the Constitution of the United States vel non?[2]

Having concluded that the complaint did not set forth sufficient factual allegations to establish state participation in the non-renewal of Dr. Braden's teaching contract about which she complains, this court, on January 31, 1972, entered an Order granting the defendants' Motion to Dismiss. On February 5, 1973, the Court of Appeals for the Third Circuit vacated said Order and remanded for an evidentiary hearing on the matter of Pitt's relationship with the Commonwealth of Pennsylvania in the light of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), wherein racial discrimination by a restaurant concessionaire operating on the premises of a state parking facility was held to be a Fourteenth Amendment violation—"under color of state law." At a hearing held on October 29, 1974, (after repeated continuances at the request of the parties) the evidence clearly established the facts set forth in this court's memorandum reported at 343 F.Supp. 836 (1972), save the finding that the Commonwealth had no proprietary interest in the University's facilities.

Additionally, with respect to the concerns of the higher court expressed in Braden v. University of Pittsburgh, 477 F.2d 1 (3rd Cir. 1973), the following circumstances, in existence on July 9, 1971, the filing date of the complaint, are pertinent:

1. The relationship between the Commonwealth and Pitt is controlled by the "University of Pittsburgh—Commonwealth Act," 1966, Special Session No. 3, July 28, P.L. 87 § 1, 24 P.S. § 2510–201 et seq.

(a) § 2510–202: ". . . [I]t is hereby declared to be the purpose of this act to extend Commonwealth opportunities for higher education by establishing University of Pittsburgh as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth system of higher education."

(b) § 2510–203: "The Charter of the University of Pittsburgh shall be amended by changing the name of University of Pittsburgh to 'University of Pittsburgh—Of the Commonwealth System of Higher Education,' . . ."

(c) § 2510–204: The board of trustees shall be composed of 36 voting members including 4 ex officio members. "Twelve of the trustees shall be designated Commonwealth trustees and four shall be appointed by the Governor, with the advice and consent of two-thirds of all of the members of the Senate, four by the President Pro Tempore of the Senate, and four by the Speaker of the House of Representatives."

(d) § 2510–205: "The entire management, control and conduct of the instructional, administrative, and financial affairs of the university is hereby vested in the board of trustees. . . ."

(e) § 2510–206: "The annual appropriation act to the University for general maintenance may specify the purposes or areas for which such appropriations may be expended by the university." The act may contain a tuition supplement requiring the University to maintain certain tuition rates and fee schedules for Pennsylvania resident full-time students, provided the amounts appropriated are sufficient for the maintenance of such schedules.

(f) § 2510–207: Amounts appropriated shall be paid to the board of

2. ". . . nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. Amend. XIV, § 1.

trustees only upon presentation of certified payrolls showing expenditures in accordance with appropriations. After the filing of a statement of expenditures by the University from Commonwealth appropriations, the Auditor General shall have the right to audit and disallow.

(g) § 2510–208: "The benefits of all Commonwealth or Commonwealth authority programs for capital development and improvement shall be available to the university under terms and conditions comparable to those applicable to land grant institutions of higher learning and State colleges. . . ."

(h) § 2510–210: "The Chancellor of the university shall each year, not later than the first day of October, make a report of all the activities of the university, instructional, administrative and financial, for the preceding scholastic and fiscal year, to the board of trustees, who shall transmit the same to the Governor and to the members of the General Assembly."

2. The structure of Pitt's Board of Trustees is established by the University's By-Laws. Defendants' Exhibit A.

(a) ARTICLE I: Pitt's Board of Trustees consists of 36 voting members, 3 ex officio non-voting members, which includes the Governor of the Commonwealth of Pennsylvania, the Mayor of the City of Pittsburgh, and the Superintendent of the Pennsylvania Department of Public Instruction,[3] in addition to 10 to 12 non-voting trustees emeriti.

(b) ARTICLE I: Twelve Charter Trustees are elected by the Board of Trustees and serve for life or until 65 years of age; six alumni trustees are elected for three-year terms by the Board of Trustees on nomination by the General Alumni Association; and six Term Trustees are elected for three-year terms by the Board. There are twelve Commonwealth Trustees who are named by public officials pursuant to the Commonwealth Act.

(c) ARTICLE III: The Chancellor is elected by the affirmative vote of 19 members of the Board of Trustees. Also "he shall be ex officio a voting member of all standing committees of the Board."

3. The names, employers, occupations, and category of the members of the Board of Trustees of Pitt are set forth in Defendants' Exhibit B.

4. The voting record of individual trustees is not kept, but, according to the testimony, the trustees appointed by the Commonwealth have never acted in a bloc.

5. All trustees, except the Chancellor, serve without compensation.

6. Concerning the views of the trustees respecting the import of the word "instrumentality" in 24 P.S. § 2510–202 (6), the following testimony is typical:

"I do not regard the University as an agency of the State. I consider it purely autonomous. I don't believe the State has any role in any of the personnel practices of the University." (Harbaugh Miller, Esq., former Commonwealth Trustee. Tr. 205).

"I do not view the University as an agency of the State, nor do I view the State as having any role in dealing with the management of the University. I view this as the prerogative of the Board of Trustees, and the Chancellor who is appointed by that Board of Trustees." (Alexandria W. Chauss, Alumni Trustee. Tr. 160).

"I think we look on our relationship with the State as a contractor for services to the State for which the University is compensated and for which the University has some responsibility or has—let me correct that—has responsibility for accounting to the State for state funds, as would

3. The By-Laws of the University were revised in 1969, making these officials non-voting members.

any contractor." (William H. Rea, Charter Trustee, Chairman of the Board of Trustees, member of the State Board of Education, Chairman of the State Council of Higher Education. Deposition 20).

"Well, I have always considered that relationship both as Chancellor of the University and as the Secretary of Education, that the University is primarily a private institution, with a relationship to the State under which they agreed to meet certain requirements as far as giving Pennsylvania residents, for example, for admission, and having State representation on the Board of Trustees. . . . [T]he instrumentality is that, as I interpret it, it is a commitment that the University has made to perform certain services for the State." (Dr. David H. Kurtzman, former Pitt Chancellor and Commonwealth Secretary of Education. Tr. 46).

Dr. Kurtzman further testified that the Commonwealth does not exercise any control over the hiring, promotion, tenure, or firing of either faculty members or other personnel. (Kurtzman, Tr. 48–49, 63–64). Similarly, Warren E. Ringler, Commonwealth Deputy Commissioner for Higher Education, testified that the Department of Education does not review individual Pitt faculty appointments. (Ringler, Deposition 77; Tr. 22).

7. The attitude of the trustees regarding sex discrimination is reflected in a 1970 Resolution of the Board, which states as follows:

"BE IT RESOLVED, that the Board of Trustees affirms its opposition to arbitrary and unlawful discrimination, and supports the efforts of the Chancellor to enforce this policy and to comply with all legal requirements related to discrimination based on sex."

In addition, when the University Committee on Women's Rights made allegations of unfair treatment, the University, under the direction of Chancellor Posvar, requested the United States Health, Education and Welfare Department to conduct an investigation. In seven of the nine cases examined, these complaints, including Dr. Braden's, were found to be without substance. In the two cases where discrimination was believed to have existed, the matter was rectified. (Freeman, Tr. 247–248).

8. Pitt, since its founding in 1787, and prior to its becoming state-related, has received aid from the state described by Trustee Freeman as "rather substantial," including an emergency loan in the amount of $5,000,000.00 in 1965, when the University, according to the testimoney of Dr. Kurtzman, "was going to run out of money before the end of 1965." Also, Pitt received the benefit of several Pennsylvania General State Authority projects during the years 1957 through 1966 amounting to $67,067,221.-00.

9. On Pitt's initiative, overtures were made to the State Board of Education in an effort to resolve the University's financial difficulties, ultimately resulting in the Commonwealth Act of 1966, *supra*. Prior to the passage of the Act, at a meeting of the State Board of Education on March 10, 1966, a Resolution was adopted wherein Pitt would increase enrollment and reduce tuition for Pennsylvania students by certain amounts. Additionally, the Resolution states: ". . . the Board recognizes that reduction in tuition alone does not make a state-related institution; rather, the University's program must be responsive to the educational needs of the Commonwealth and the University's program must take this into account."

10. Since the passage of the Act, Commonwealth appropriations received by Pitt account for approximately one-third of its operating budget. Revenue from the Commonwealth represented 32.4% of the gross revenue for the fiscal

year 1971–72 and 35.1% for the year ending June 30, 1974. The amounts appropriated are as follows:

| | |
|---|---|
| 1968–69 | $32,003,000.00 |
| 1969–70 | $37,899,000.00 |
| 1970–71 | $37,899,000.00 |
| 1971–72 | $40,556,000.00 |
| 1972–73 | $45,582,000.00 |
| 1973–74 | $47,919,000.00 |

Commonwealth appropriations flow into three general categories: first, the general account, which covers the difference between cost and tuition; second, student aid; and third, medical education. Chancellor Posvar testified that it is impossible to "earmark where each dollar of income goes," but a portion of the Commonwealth appropriations (37.7% in 1973) are used to pay faculty salaries. The Commonwealth has authority to audit state appropriations only. With respect to those funds not appropriated by the state, the Auditor General or the Legislature has also the right to review.

Budget submissions are structured according to state procedure. The budget request of the University goes to the Department of Education which transmits it to the State Board of Education for approval or disapproval. Requests are also submitted to the Budget Secretary, and then the State Board's recommendations and findings are submitted to the General Assembly subsequent to the submission of the Governor's budget. Consultations with the University are held concerning its entire budget. Pitt, of course, solicits both the executive and legislative branches for the highest appropriation available.

11. The Auditor General has commented on Pitt's accounting procedure regarding non-state funds and recommended the use of uniform University accounting procedures.

12. The Commonwealth, through Pennsylvania General State Authority projects, has provided approximately one-third of all the buildings utilized by Pitt. The cost of these projects since 1966 has been $93,817,204.00. In addition, Pitt financed capital improvements through the Pennsylvania Higher Educational Facilities Authority of which plaintiff lists two projects in the amounts of $6,500,000.00 and $617,000.00. Pitt has exclusive responsibility for the maintenance and control of these buildings and facilities.

Hence, Dr. Braden, pointing to Pitt's financial dependence upon the Commonwealth, its use of facilities provided under the auspices of the Commonwealth, its designation as an instrumentality of the Commonwealth, the one-third representation on its Board of Trustees by Commonwealth appointees, the direct involvement of the Commonwealth in its tuition, audit, and appropriation procedures, the Commonwealth goal of expanded educational opportunity for the public, presents Pitt as a private institution (a "person" within the meaning of the Civil Rights Act of 1871) whose every activity, by reason of a symbiotic relationship with the Commonwealth in the field of higher education, is performed under "color of state law."

Pitt points to its charter as a private institution, to the delegation by the Commonwealth of exclusive management control over all Commonwealth facilities utilized by Pitt, and to the absence of any direct involvement of the Commonwealth in Pitt's managerial policy relating to personnel affairs. It contends, therefore, that inasmuch as the state was interested in fiscal affairs only, and pursued a policy of non-interference in Pitt's internal administrative affairs, Pitt, in its dealing with the plaintiff, was not required to meet constitutional standards—that its action, not having been sanctioned by the Commonwealth, was private.

■ Both parties having stipulated that Pitt is not a state agency, Pitt is deemed to have waived whatever Eleventh Amendment state immunity it may have, thus eliminating any jurisdictional issue in this respect. (Defendants' Requests for Conclusions of Law, No. 20.)

Nor is it contended that Pitt's failure to renew Dr. Braden's contract was effected in compliance with any specific state law or regulation, as in Reitman

v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), or in the performance of a delegated function traditionally associated with sovereignty, as in Evans v. Newton, 382 U.S. 296, 86 S. Ct. 486, 15 L.Ed.2d 373 (1966).

■■■ The issue, then, requires a view of the totality of circumstances surrounding the arrangement between the Commonwealth and Pitt at the time of the alleged injury for the purpose of determining whether or not an inference of state involvement in the challenged action of Pitt is reasonable. The solution, therefore, will be sought through analysis of the teachings of Burton v. Wilmington Parking Authority, *supra,* in which state action was attributed to a private enterprise engaging in joint activity with the state in the operation of a state parking facility and Jackson v. Metropolitan Edison Company, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), in which a contrary result was reached in the case of an extensively state-regulated private utility company. Admittedly, neither of these cases presents the factual situation at hand, but plaintiff relies heavily on *Burton's* principles and defendants contend that *Jackson's* teachings lead to the more appropriate conclusion.

*Burton* admonishes:

"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." 365 U.S. at 722, 81 S.Ct. at 860.

\* \* \* \* \* \*

The Court then observes:

"The land and building were publicly owned. As an entity, the building was dedicated to 'public uses' in performance of the Authority's 'essential governmental functions.' . . . the commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit. Upkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds. . . .

"*Addition* of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn. . . . in its lease with *Eagle* the Authority could have affirmatively required *Eagle* to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. Certainly the conclusions drawn in similar cases by the various Courts of Appeals do not depend upon such a distinction. By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with *Eagle* that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S. at 723–725, 81 S.Ct. at 861.

When, by legislative enactment, Pitt was adopted into a Commonwealth system of higher education coordinated by a state agency, was re-named "University of Pittsburgh—of the Commonwealth System of Higher Education;" was styled "state-related" and "an instrumentality of the Commonwealth," and

was subjected to audit and review; when more than 150 million dollars of Commonwealth funds were committed to Pitt in the form of building facilities and one-third of Pitt's operating expenses were paid by the Commonwealth; when one-third of Pitt's managing board members were appointed by the Commonwealth, with a full vote in all of Pitt's management affairs; when Pitt was committed to make its facilities available to more students at a reduced rate and to make its program "responsive to the needs of the Commonwealth;" and when continued appropriations from the Commonwealth became vital to Pitt— in the words of *Burton*, the Commonwealth "insinuated itself into a position of interdependence" with Pitt.

*Jackson* teaches:

". . . . [t]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. *Moose Lodge No. 107*, supra [407 U.S.] at 176 [, 92 S.Ct. 1965 at 1973]. The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met. Burton v. Wilmington Parking Authority, *supra.*

\* \* \* \* \* \*

"We also find absent in the instant case the symbiotic relationship presented in Burton v. Wilmington Parking Authority, 365 U.S. 715 [, 81 S.Ct. 856, 6 L.Ed.2d 45] (1961). There where a private lessee, who practiced racial discrimination, leased space for a restaurant from a state parking authority in a publicly owned building, the Court held that the State had so far insinuated itself into a position of interdependence with the restaurant that it was a joint participant in the enterprise. *Id.*, at 725 [, 81 S.Ct. at 861]. We cautioned, however, that 'while a multitude of relationships might appear to some to fall within the Amendment's embrace,' differ-

ences in circumstances beget differences in law, limiting the actual holding to lessees of public property. *Id.*, at 726 [, 81 S.Ct. at 862].

\* \* \* \* \* \*

"All of petitioner's arguments taken together show no more than that *Metropolitan* was a heavily regulated private utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and that it elected to terminate service to petitioner in a manner which the Pennsylvania Public Utilities Commission found permissible under state law. Under our decision, this is not sufficient to connect the State of Pennsylvania with respondent's action so as to make the latter's conduct attributable to the State for purposes of the Fourteenth Amendment."

It is noteworthy that, although the Supreme Court in *Jackson* seemingly limits the actual holding in *Burton* to a lessor-lessee relationship, it recognizes joint participation in an undertaking between the State and a private institution as a significant factor in determining state action whether or not a particular transaction may have been specifically sanctioned by the State. The Court did not disturb the *Burton* doctrine that inaction on the State's part does not foreclose the issue of the State's involvement in a challenged activity. Moreover, the Court, in addition to its observation, as above set forth, that in *Burton* the state and the restaurant were joint participants in a single enterprise, makes note of the fact that in *Jackson* the utility company was the sole owner of all the property utilized in its business.

This court concludes, therefore, that *Jackson* does not preclude application of the familiar principles having to do with the vicarious responsibilities of parties engaged in joint enterprise. In doing so, not only the *Burton* absence of "purely private" action on the part of Pitt but the *Jackson* "sufficiently close nexus between the State and the challenged action of the regulated entity so

that the action of the latter may be fairly treated as that of the State itself," is established.

. Pitt was acting under "color of state law" when it engaged in the activity challenged by Dr. Braden. Therefore, this court has jurisdiction under 28 U.S.C.A. § 1343, 42 U.S.C.A. § 1983, and pendent jurisdiction under the Pennsylvania Equal Pay Law, 43 P.S. § 336.2 et seq.

An appropriate Order will be entered.

### ORDER

And now, this 13th day of March, 1975, for the reasons set forth in the foregoing Memorandum,

It is ordered that the defendants' Motion to Dismiss the Amended Complaint in the above styled action be and the same is hereby denied as to plaintiff's claim based on 42 U.S.C.A. § 1983 and 43 P.S. § 336.2 et seq.

It is further ordered, for the reasons set forth in Braden v. University of Pittsburgh et al., D.C. 343 F.Supp. 836 (1972), the defendants' Motion to Dismiss be and is hereby granted as to plaintiff's claim based on 42 U.S.C.A. § 1981 and Executive Order No. 11246, as amended.