249 Pa. Superior Ct. 164 (1977)
375 A.2d 810
Steven H. BRUSH, on behalf of himself and as representative of a class, Michael J. Mullen, on behalf of himself and as representative of a class, and Kimberly Getz, on behalf of herself and as representative of a class, Appellants,
v.
The PENNSYLVANIA STATE UNIVERSITY BOARD OF TRUSTEES of the PENNSYLVANIA STATE UNIVERSITY, John W. Oswald, Individually and as President of the Pennsylvania State University, M. Lee Upcraft, Individually and as Director of Residence Hall Programs of the Pennsylvania State University.
Superior Court of Pennsylvania.
Argued September 15, 1976.
Decided June 29, 1977.
*165 Virginia B. Eisenstein, State College, for appellants.
*166 Grant H. Fleming, State College, with him Delbert J. McQuaide, State College, for appellees.
Before JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.
PER CURIAM:
The six Judges who heard this case being equally divided the decree of the court below is affirmed.
PRICE, J., files an opinion in support of affirmance in which JACOBS and VAN der VOORT, JJ., join.
HOFFMAN, J., files an opinion in support of a reversal in which CERCONE and SPAETH, JJ., join.
WATKINS, President Judge, did not participate in the consideration or decision of this case.
PRICE, Judge, in support of affirmance:
Appellants seek an injunction to restrain enforcement of certain University regulations which prohibit door-to-door canvassing in a campus dormitory if a majority of the residents agree that canvassing should be prohibited. After full and final hearings in the lower court, a decree nisi was entered on February 4, 1977, denying the relief sought by appellants. This appeal was taken from the final decree entered by the court below on April 2, 1976. We would affirm the order of the court below.
The appellants' main premise is based upon an equation of the facts of the instant case with a traditional door-to-door canvassing situation. We reject this analogy and would adopt the rationale of the lower court.
In its adjudication, the lower court concluded that the hallways on the upper floors of a dormitory are not akin to public streets and that residents do have certain justifiable privacy interests in these "common areas." The lower court explained its rejection of the "public street" concept as follows:

*167 "Plaintiffs place heavy reliance on the case of James, et al v. Nelson, 349 F.Supp. 1061 (N.D.Ill. 1972). The language contained therein is most favorable to the plaintiff's contention in this case. We choose not to follow this decision for the reason that the Court in that case was not made aware and did not consider the physical aspects of the dormitory structures. We believe it to be unrealistic to compare the upper floor hallway and bedroom door of a dormitory resident to be the same as a public street and the front door of a private dwelling. We prefer to adopt the rationale that the upper floor areas of the residence halls are private living quarters . . . . This position is supported in the case of National Movement For The Student Vote v. Regents of the University of California, 123 Cal.Reporter 141 (1975); see also Futrell, et al v. Ahrens, et al, Supreme Court of New Mexico (Aug. 20, 1975)" (Printed Record, hereinafter PR, at 323a-24a).
It is well established that while a chancellor's inferences and ultimate conclusions from primary facts are always open to review, they will not be set aside unless the reviewing court can say that they are unreasonable and unjustified. Bohachevsky v. Sembrot, 368 Pa. 228, 81 A.2d 554 (1951). We find the lower court's analysis persuasive and its inferences reasonable.
At the hearing, a substantial portion of the testimony related to the physical layout of the upper level dormitory floors. Based on this testimony, the lower court found, in part, as follows: Each floor contains a series of private or semi-private rooms which abut and open on a common hallway. Lavatories, study lounges, storage areas for linen and personal belongings, party line telephones, and full length dressing mirrors, all of which are located on or adjacent to the hallways, are used in common by floor residents. The evidence clearly established that students must leave their individual bedrooms and traverse the hallway to utilize these various facilities, the functions of which are, for the most part, traditionally private in nature.
In Lehman v. City of Shaker Heights, 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974), the Supreme Court *168 declared that "open spaces and public places differ very much in their character, and before you could say whether a certain thing could be done in a certain place you would have to know the history of the particular place." This history is equally relevant in determining whether an area should initially be considered an open space and, therefore, whether appellants' "public street" analogy is appropriate in the instant case. It is important to remember that "[t]he State, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." Adderley v. Florida, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); see also Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).
Prior to the adoption of the current regulations on February 15, 1975, no canvassing was permitted in any residence hall. Even after adoption, these new regulations should not be viewed in a vacuum. The canvassing regulations comprise only one segment of the University's rules and regulations relating to a person's rights to use a dormitory in which he is not a resident. A review of the pertinent regulations demonstrates a continuing attempt by the University to provide the optimum balance between an individual resident's justifiable expectations of privacy and other residents' rights to free speech and assembly. These regulations are reviewed below.
Every entrance and exit door in a residence hall is posted with the following notice:
"NO TRESPASSING PRIVATE RESIDENCE
This building is restricted to persons assigned as residents, their invited guests and authorized University personnel." (NT at 161a; Defense Exhibit No. 3, PR at 276a).
A copy of the 1975-76 Student Handbook containing, inter alia, the regulations governing dormitory use was introduced at the hearing held on October 16, 1975. (Defense Exhibit No. 5, PR at 277a-303a). In addition to regulating canvassing, *169 these rules prohibit fund raising,[1] solicitation,[2] and contribution drives[3] on a door-to-door basis in residence halls and regulate visitation rights of individuals who are nonresidents of the dormitory which they seek to visit. Moreover, they provide that floor residents are jointly liable for damages occurring to the common areas.
With regard to visitation rights, University policies are designed to provide the maximum freedom of association while preserving, to the extent possible, other students' rights to privacy. One of the factors to be considered by students in selecting the particular dormitory in which to live is the opposite sex visitation policy[4] of the dormitory. While twenty-four hour visitation is permitted in the majority of dormitories, a student who desires more privacy may choose to reside in a nonvisitation or limited visitation dormitory. Opposite sex visitation is prohibited in nonvisitation dormitories and restricted to the hours of 7 a.m. to midnight in limited visitation dormitories. (Defense Exhibit No. 5, PR at 278a-79a).
Moreover, where visitation rights of any type exist, visitors are permitted in rooms only if there is no objection from *170 roommates. Opposite sex visitors must be escorted to and from a student's room. While same sex visitors apparently are not required to be escorted, they are not permitted to wander through dormitories other than their own. (Defense Exhibit 5, Additional Regulations § C; PR at 303a; see also NT at 221a-22a). Testimony demonstrated that the visitation policy is enforced by resident assistants who supervise a limited number of students and therefore know those who live within their area of control. Same sex visitors who are unknown to the resident assistant are challenged and must have a specified destination within the area. If they do not, they are requested to leave and, if students, are subject to disciplinary action.
The above discussion, while not dispositive of the case, amply demonstrates that appellants have avoided the real issue in this case by their conclusory equation of an upper level dormitory hallway with a public street.[5] While it is true that the first amendment protects the rights of the minority as well as those of the majority, it is well established that the University could adopt a regulation prohibiting canvassing in a dormitory if the residents voted unanimously to do so.
"To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or *171 television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit . . . . The ancient concept that `a man's home is his castle' into which `not even the king may enter' has lost none of its validity . . . ." Rowan v. Post Office Dept., 397 U.S. 728, 737, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970).
Any comparison of the first amendment rights of speakers against the privacy rights of those who may be unwilling viewers or auditors "demand[s] [a] delicate balancing because:
`[i]n th[e] sphere of collision between claims of privacy and those of [free speech or] free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society.' Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975).
Although each case ultimately must depend on its own specific facts, some general principles have emerged. A State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content. (citations omitted). But when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its powers. (citation omitted) Such selective restrictions have been upheld only when the speaker intrudes on the privacy of the home, see Rowan v. Post Office Dept., 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed. 736 (1970), or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure. See Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 supra." Erznoznik v. City of Jacksonville, 422 U.S. 205, 208-09, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975) (emphasis added) (footnotes omitted).
*172 The regulations in question do not attempt to regulate speech on the basis of content.[6]Compare Erznoznik v. City of Jacksonville, supra; Southeastern Promotions v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). They are place and manner regulations applicable to all canvassing irrespective of content. When viewed in combination with other regulations described above, they are designed to regulate the manner of use of the residence halls. Reasonable and nondiscriminatory manner and use regulations which are designed to further significant governmental interests are permitted. Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966).
In the context of the instant case, the efficient and orderly administration of a University residence hall in order to preserve the justifiable right of privacy in upper floor hallways is clearly a significant interest. See Erznoznik v. *173 City of Jacksonville, supra. In Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), the Supreme Court recognized the significant interest of the city council in preserving the privacy of its residents; however, the Court struck down an anti-doorbell ringing ordinance primarily because the ordinance was drafted too broadly. Legislation was available which would have permitted individual residents to prohibit door-to-door canvassing by posting their property with "no solicitation" signs and to prosecute violators under criminal trespass laws. Such a procedure would have provided the appropriate balance between those residents who desired to hear and those who did not. In the instant case, posting of individual rooms would be totally ineffective in preserving any right of privacy in the common hallways and would create a right to "insert a foot in the door and insist on a hearing"  a right rejected by the Supreme Court in Kovacs v. Cooper, 336 U.S. 77, 86, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949).
The question which remains, therefore, is whether the regulations in question are reasonable. Even under Martin v. City of Struthers, supra, they should be upheld if they provide the narrowest possible curtailment of first amendment rights consistent with the preservation of the significant governmental interest. The facts demonstrate that the regulations are exceedingly reasonable and meet these tests.
Even in closed dormitories, canvassing is permitted in the main lobbies. While students may be able to exit from a dormitory by other means, they may only enter through the main lobby. All other doors can be opened only from the inside. Moreover, each dormitory is equipped with an "intercom" system by which each resident may be paged from the main lobby. Canvassers are permitted to use this system to speak to individuals and attempt to secure invitations. Likewise, canvassers may telephone individual residents from other areas of the campus to seek invitations. If permission is granted, the canvasser is subject only to those regulations relating to visitors.
*174 These provisions adequately protect the rights of those residents who wish to hear. As previously discussed, the canvasser has no right to force his views on unwilling residents. The fact that door-to-door canvassing may be more convenient is entitled to little weight in this case. "The guarantees of the First Amendment have never meant `that people who want to propagandize protests or views have a constitutional right to do whenever and however and wherever they please'." Greer v. Spock, supra 424 U.S. at 836, 96 S.Ct. at 1216, quoting Adderley v. Florida, supra 385 U.S. at 48, 87 S.Ct. 242.
We would affirm the order of the lower court.
JACOBS and VAN der VOORT, JJ., join in this opinion.
WATKINS, President Judge, did not participate in the consideration or decision of this case.
HOFFMAN, Judge, in support of reversal:
On May 12, 1975, appellants[1] filed a complaint in equity in which they requested that the court restrain appellees[2] from enforcing Pennsylvania State University's policy prohibiting door-to-door political canvassing in its residence halls upon a vote of a majority of the residents. The sole issue in the instant case is whether the challenged restriction is an unconstitutional abridgement of the First and Fourteenth Amendments of the United States Constitution. I would hold that the regulations are overbroad and, therefore, would reverse.
The following are the facts developed at the September 11, 1975 and October 16, 1975 hearings on appellants' application for a final injunction. On February 15, 1975, appellees *175 adopted several regulations governing canvassing in the various residence halls on the University's Centre County campus:
"a. Canvassing shall be defined as any effort to influence student opinion, gain support, or promote a particular cause or interest, specifically excluding any solicitation or fund raising as defined by current University policy.
"b. Students, student organizations, residence hall house governments and area governments, and outside interests are eligible to canvass in the residence halls.
"c. Canvassing may occur in individual residence hall buildings unless restricted by a majority vote of the residents of that building at the beginning of each academic year. Canvassing is permitted in all main lobbies of residence halls.
"d. Canvassing may occur in dining hall buildings. Canvassing in dining rooms is prohibited.
"e. Canvassing shall be restricted to the hours of 11:00 a.m. to 11:00 p.m.
"f. Any canvasser must register with the area coordinator no less than 24 hours prior to the canvass and must clearly understand all provisions of canvassing regulations before canvassing may begin.
"g. When contacting students in their rooms, canvassers must knock before entering, identify themselves, announce their specific purpose, enter an individual room only by the express consent of the resident, and leave immediately if the resident so requests.
"h. Canvassers must abide by all University rules and regulations. Violators will be subject to referral to the Office of Conduct Standards and/or civil or criminal prosecution."
Shortly after promulgation of those rules, appellees distributed ballots to students to determine the canvassing policy of each hall. A majority of the students in 20 of 62 residence halls on campus voted to exclude door-to-door canvassing. Again, prior to both the 1975 summer and fall *176 sessions, appellees distributed the ballots in the various residence halls, resulting in a total of 45 halls in which canvassing was prohibited.
During the spring of 1975, appellant Steven Brush, a student at the University, began working for two candidates for the Borough Council of State College, Centre County. His assignment included door-to-door canvassing on the University campus in an effort to talk personally to students about the two candidates. At that time, he discussed the policy with University officials with the hope that they would open residence halls to people involved in political campaigns because "when we went door to door for the voters it would work a lot better." He did not attempt to canvass in halls in which that activity was prohibited because he was apprised that sanctions would be imposed by the University and by State College authorities.
As a result, on May 12, 1975, Brush and appellant Mullen brought the instant action in equity on behalf of themselves and as representatives of a class of all others similarly situated. Rule 2230, Pa.R.C.P., 42 Pa.C.S. § 2230. They sought an injunction restraining appellees from prohibiting door-to-door canvassing. On May 14, the court denied a preliminary injunction. Thereafter, the court granted appellant Getz's petition to intervene as a plaintiff because appellant Mullen no longer resided on the campus. After a hearing on a final injunction, the lower court entered a February 4, 1976 decree nisi denying the relief sought by appellants. This appeal followed.
During oral argument before this Court on September 15, 1976, we requested that counsel file supplemental briefs on the question of appellate jurisdiction. See Appellate Court Jurisdiction Act, July 31, 1970, P.L. 673, No. 223, art. I, § 101 et seq.; 17 P.S. § 211.101 et seq. Therefore, we must first resolve whether the parties are properly before us.
Section 302 of the Appellate Court Jurisdiction Act, supra, makes clear that this Court has jurisdiction of all appeals except those specified elsewhere in the Act as being within the exclusive jurisdiction of either the Commonwealth Court *177 or the Supreme Court. Sections 402 and 403 set forth the jurisdiction of the Commonwealth Court.[3] The instant action *178 does not even arguably involve an appeal from an action ". . . arising under any county, institution district, city, borough, incorporated town, township, public school, planning or zoning code or under which a municipality or other political subdivision or municipality authority may be formed or incorporated . . ." or an action requiring interpretation of rules and regulations of local governments or similar entities, 17 P.S. § 211.402(4), or from an action by a local administrative agency under the Local Agency Law, 17 P.S. § 211.402(5), or from proceedings under the Eminent Domain Code, 17 P.S. § 211.402(6). Therefore, we must determine whether the instant case involves an appeal from a civil action "to which the Commonwealth. . . is a party . . . ." 17 P.S. § 211.402(1).
The Administrative Code[4] makes specific reference to the various "departments, departmental administrative boards and commissions, officers, independent boards or commissions, [and] authorities . . . ." The Code does not list the University in any of those categories. The General Assembly has specifically designated the various state colleges and Indiana University as departmental administrative boards within the Department of Education.[5] Thus, by process of elimination, jurisdiction turns on whether Pennsylvania State University is an "agency" within the meaning of the Appellate Court Jurisdiction Act.
The Act does not define "agency". Further, whether Pennsylvania State University is an agency for purpose of the Act is a question of first impression. We find some *179 guidance in our Supreme Court's decision in Mooney v. Temple University, 448 Pa. 424, 292 A.2d 395 (1972).
In Mooney, the Court affirmed the Commonwealth Court's decision that "the Legislature, in designating Temple as part of the Commonwealth System of Higher Education in order to enable Temple to receive increased financial assistance from the Commonwealth, did not transform Temple into a state `agency' for purposes of the Act." 448 Pa. at 426, 292 A.2d at 396. The Act involved in Mooney was the Inspection and Copying Records Act[6] which defined "agency" as "Any department, board or commission of the executive branch of the Commonwealth, any political subdivision of the Commonwealth, the Pennsylvania Turnpike Commission, or any State or municipal authority or similar organization created by or pursuant to a statute which declares in substance that such organization performs or has for its purpose the performance of an essential governmental function."
The Court examined the following factors in determining that Temple was not sufficiently "`similar' to a `State or municipal authority'" for purposes of the Inspection and Copying Records Act: Temple was originally chartered as a non-profit corporation, but became "state-related" pursuant to an act of the legislature[7] which provided that Temple "shall continue as a corporation for the same purposes as, with all rights and privileges heretofore granted to, Temple University . . .".[8] While the Temple University-Commonwealth Act altered the board of trustees to include public officials, non-public individuals constituted a majority of the trustees and the board retained the power of management and control. Despite considerable financial assistance monitored by the Auditor General, the Court concluded that "[t]his regulatory scheme provided by the Legislature to safeguard against improper expenditures of public funds in *180 no way intrudes upon or alters Temple's status as a nonprofit corporation chartered for educational purposes." 448 Pa. at 433, 292 A.2d at 400.
Pennsylvania State University was similarly established as a corporation for educational purposes. Act of February 22, 1855, P.L. 46, § 1 et seq.; 24 P.S. § 2531 et seq. Section 2 of the Act provides for management and control by a board of trustees which is currently composed of 32 members only ten of whom are public officials. By contrast, the Governor appoints the entire membership of the boards for state colleges and Indiana University, specified as departmental administrative boards. Act of March 10, 1949, P.L. 30, art. XX, § 2003.1, added 1970, Feb. 17, P.L. 24, No. 13, § 4, eff. July 1, 1969; 24 P.S. § 20-2003.1; Act of March 10, 1949, supra; as amended December 6, 1972, P.L. 1413, No. 306, § 1; 24 P.S. § 20-2008.1. The board of trustees of Pennsylvania State University retains authority over disposition of the property of the corporation not subject to review by the Commonwealth, Act of February 22, 1855, supra; 24 P.S. § 2533, while the boards of the state colleges must act with approval of the Commonwealth in managing affairs of those institutions. Act of March 10, 1949, supra; 24 P.S. §§ 20-2003.3, 2008.3. Finally, while Pennsylvania State University receives extensive money from the Commonwealth, we find that the Commonwealth's participation in the financial matters of the University is indistinguishable from its participation in those of Temple. Therefore, for purposes of jurisdiction, I believe that the University is not an agency of the Commonwealth. Mooney v. Temple University, supra; see also, Burton v. Temple University Law School, 18 Pa.Cmwlth. 306, 335 A.2d 830 (1975). I, therefore, reach the merits of appellants' claim.
Appellants contend that the right to canvass is protected by the First and Fourteenth Amendments. The appellees argue that the right to canvass is not an absolute right and that their regulations are sufficient compliance with the Constitution.
*181 Despite my view that Pennsylvania State University is not an agency of the Commonwealth for jurisdictional purposes, that does not immunize the University from constitutional rules governing state action. A review of recent federal court decisions forecloses the argument that action by the University is not state action within the context of constitutional analysis. Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973); Braden v. University of Pittsburgh, 392 F.Supp. 118 (W.D.Pa. 1975); Rackin v. University of Pennsylvania, 386 F.Supp. 992 (E.D.Pa. 1974). As noted in Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473, 476 (E.D.Pa. 1974), ". . . `In essence, the Temple University-Commonwealth Act establishes a working partnership between the University and the State. Temple retains its private corporate identity, but the Commonwealth shares in the control of the institution through the appointment of one-third of Temple's Board of Trustees and through the financial accountability provisions written into the Act.' The Act thus created an `organic relationship between Temple University and the Commonwealth' that is `the same as that between the Commonwealth and the Pennsylvania State University. Both of these institutions, while private in corporate identity, are invested with a quasi-public character and charged with certain public responsibilities, obligations and commitment.'" (Emphasis added) The Court distinguished Mooney as follows:
". . . It is clear that the Court in Mooney, while rendering an authoritative interpretation of Pennsylvania law, did not address itself to the relevant question of federal constitutional law, namely, whether Temple's activities can properly be classified as `state action' or action `under color of' state law." 385 F.Supp. at 495. Therefore, the contested regulations must comply with the requirements of the Constitution. Cf. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).
The United States Supreme Court has frequently addressed cases involving a community's efforts to immunize its citizens from door-to-door canvassers. See, e.g., Hynes *182 v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). As noted by the Court in Martin v. City of Struthers, supra, 319 U.S. at 141, 63 S.Ct., at 862:
"For centuries it has been a common practice in this and other countries for persons not specifically invited to go from home to home and knock on doors or ring doorbells to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings. Whether such visiting shall be permitted has in general been deemed to depend upon the will of the individual master of each household, and not upon the determination of the community." At the same time, the Court has repeatedly stated that a government may regulate expressive activity in time, place and manner. Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Martin v. City of Struthers, supra. Such regulations, however, must be based on a compelling interest of the state, Grayned v. City of Rockford, supra, and must be drafted with "narrow specificity." NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). See also, Hynes v. Mayor and Council of Borough of Oradell, supra.
Appellees base the contested regulations on two interests: first, the University seeks to maintain the students' privacy and comfort. Second, "[u]niversity officials, as well as student-residents of the dormitories, believe that the policy which allows students, by majority vote, to determine *183 whether canvassing will be permitted in the hallways of the residence halls serves an educational purpose of promoting concepts of self-government and increased awareness and enforcement by the residents of their living policies in general." (Appellees' brief).[9]
We must address each interest to determine whether it is sufficiently compelling to justify curtailment of appellants' First Amendment rights. First, I believe that the infringement of residents' privacy is minimal. Appellees offered no proof that canvassing has caused any disturbance in halls in which it has been permitted. Further, appellants do not challenge the appellees to regulate times and manner of door-to-door canvassing. The appellees can limit canvassing to day-time hours during which privacy is not a paramount concern when, for example, maintenance personnel would be in the building. Finally, when confronted with an analogous factual situation in James v. Nelson, 349 F.Supp. 1061, 1063 (N.D.Illinois 1972), the court rejected the privacy argument: "This is not a case involving demonstrations, the occupation of university property, or other circumstances where injury to persons or property is imminent or even foreseeable. The individual dormitory residents' rights to privacy in their rooms can be protected by `no canvassing' signs, or by simply telling canvassers to go away."
Second, I reject the appellees' position that teaching "concepts of self-government" justifies limitations of First Amendment rights. It is a basic tenet of constitutional law that the First Amendment protects a minority's rights as well as those of a majority. Cf. Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Tinker v. Des Moines *184 Independent Community School District, supra. Appellees' regulations permit a majority of students to regulate the right of a minority to have free access to information. Appellees cannot limit the rights of a minority of its students in such a manner. Healy v. James, supra; nor can they delegate that power to a majority of its students. Finally, again as noted by the court in James v. Nelson, supra, at 1063, "[t]his case involves more . . . than the rights of those students who chose not to allow canvassing. Also to be considered are the rights of other residents to choose to hear the canvassers. The First Amendment embraces the right to hear as well as to speak. . . . It might be argued that various alternative means are available to carry the issues to the students. Meetings, distribution of literature, and personal contacts in the public areas of the campus, including the lounges and lobbies of the dormitories, are permitted. But this does not justify the deprivation of what Justice Black recognized as one of the traditional methods of `canvassing.'"
I do not conclude that the appellees may impose no regulations concerning door-to-door canvassing. For example, appellees may continue to require canvassers to register before they enter the residence halls as long as registration is not used to discriminate against certain activities. Further, appellees may limit the hours during which canvassers may enter the residence halls.
Because the regulations as drafted are too broad in their prohibition of free speech, I would reverse the order of the lower court and remand for proceedings consistent with this opinion.
CERCONE and SPAETH, JJ., join in this opinion.
NOTES
[1] University Policies, Rules and Procedures in the Area of Student Affairs, (hereinafter University Policies) §§ B.1. & 3., PR at 292a. Fund raising includes the following activities conducted by registered student organizations: The sale of materials clearly related to the purpose of the organization, and the collection of dues, initiation fees, donations, and admission charges.
[2] University Policies § B.4.; PR at 292a. Solicitation is defined as "any activity [by registered student organizations] which raises funds through direct contribution or sale of merchandise for any non-University organization or enterprise." University Policies § B.4.a.
[3] University Policies § B.5.; PR at 293a. Contributions are defined as "donations without products or services rendered," University Policies § B.5.a., and this subsection applies to activities "conducted on behalf of charitable organizations or other causes deemed worthy of support by the area government." University Policies § B.5.h.
[4] The other major choice in housing policies involves the regulation of quiet hours. In most dormitories quiet hours extend from 7:30 p. m. to midnight. Certain dormitories, however, have extended quiet hours from 7 p.m. to 7 a.m.
[5] Mr. Justice Roberts' dissertation, in Hague v. CIO, 307 U.S. 496, 515-16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939), provides an interesting comparison between the history and nature of the first amendment rights applicable to a municipality's open streets, sidewalks, and parks, and that of the University's upper level dormitory hallways as previously discussed.

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." (emphasis added).
[6] The canvassing regulations currently provide as follows:

a. Canvassing shall be defined as any effort to influence student opinions, gain support, or promote a particular cause or interest, specifically excluding any solicitation or fund raising as defined by current University policy.
b. Students, student organizations, residence hall house governments and area governments, and outside interests are eligible to canvass in the residence halls.
c. Canvassing may occur in individual residence hall buildings unless restricted by a majority vote of the residents of that building at the beginning of each academic year. Canvassing is permitted in all main lobbies of residence halls.
d. Canvassing may occur in dining hall buildings. Canvassing in dining rooms is prohibited.
e. Canvassing shall be restricted to the hours of 11:00 a.m. to 11:00 p.m.
f. Any canvasser must register with the area coordinator no less than 24 hours prior to the canvass and must clearly understand all provisions of canvassing regulations before canvassing may begin.
g. When contacting students in their rooms, canvassers must knock before entering, identify themselves, announce their specific purpose, enter an individual room only by the expressed consent of the resident, and leave immediately if the resident so requests.
h. Canvassers must abide by all University rules and regulations. Violators will be subject to referral to the Office of Conduct Standards and/or civil or criminal prosecution.
[1] Appellants brought this action on behalf of themselves and on behalf of all others similarly situated. Rule 2230, Pa.R.C.P., 42 Pa.C.S. § 2230. They represent both residents of the University community at Pennsylvania State University's Centre County campus and individuals who attempted unsuccessfully to canvass door-to-door in some of the University's residence halls.
[2] Appellees are the University, the Board of trustees, the President of the University, and the Director of the Residence Hall program.
[3] Specifically, those sections provide:

"§ 211.402
"The Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in any of the following cases, except such classes of appeals as are by section 202 of this act within the exclusive jurisdiction of the Supreme Court:
"(1) All civil actions or proceedings to which the Commonwealth or any officer thereof, acting in his official capacity, is a party, except actions or proceedings in the nature of applications for a writ of habeas corpus or post-conviction relief not ancillary to proceedings within the appellate jurisdiction of the court;
"(2) All criminal actions or proceedings for the violation of any rule, regulation or order of any administrative agency of the Commonwealth;
"(3) All appeals from administrative agencies of the Commonwealth authorized by act of the General Assembly to be determined initially in the courts of common pleas;
"(4) All actions or proceedings arising under any county, institution district, city, borough, incorporated town, township, public school, planning or zoning code or under which a municipality or other political subdivision or municipality authority may be formed or incorporated or where is drawn in question the application, interpretation or enforcement of (i) any act of the General Assembly regulating the affairs of political subdivisions, municipality and other local authorities or other public corporations or of the officers, employes or agents thereof, acting in their official capacity, or (ii) any home rule charter or local ordinance or resolution;
"(5) All appeals from local administrative agencies under the Local Agency Law or otherwise.
"(6) All proceedings arising under the Eminent Domain Code or where there is drawn in question the power or right of a condemnor to appropriate the condemned property.
§ 211.403
"The Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of administrative agencies in any of the following cases:
"(1) All appeals from administrative agencies of the Commonwealth under the Administrative Agency Law or otherwise and including appeals from the Pennsylvania Public Utility Commission, the Unemployment Compensation Board of Review and from any department, departmental administrative board or commission, independent board or commission or other agency or administrative officer of this Commonwealth having statewide jurisdiction except:
"(i) matters relating to suspensions of official inspection station certificates of appointment and to the privilege of operating motor vehicles or tractors, including the revocation or suspension of such privilege and matters relating thereto;
"(ii) matters authorized by the Liquor Code to be appealed to the courts of common pleas;
"(iii) matters authorized by The Pennsylvania Workmen's Compensation Act or The Pennsylvania Occupational Disease Act to be appealed to the courts of common pleas; and
"(iv) matters authorized by the Inheritance and Estate Tax Act of 1961 or by any predecessor act to be appealed to the courts of common pleas."
[4] Act of April 9, 1929, P.L. 177, art. I, § 1; as amended, February 1, 1966, P.L. (1965) 1849, § 1; December 18, 1968, P.L. 1232, No. 390, § 1; May 6, 1970, P.L. 356, No. 120, § 1; December 3, 1970, P.L. 834, No. 275, § 1; July 22, 1975, P.L. 75, No. 45, § 1; December 19, P.L. 602, No. 172, § 1; 71 P.S. § 61.
[5] Administrative Code, supra; 71 P.S. § 62.
[6] Act of June 21, 1957, P.L. 390, § 1 et seq.; 65 P.S. § 66.1 et seq.
[7] Temple University-Commonwealth Act, Act of November 30, 1965, P.L. 843, § 1 et seq.; 24 P.S. § 2510-1 et seq.
[8] Id., § 3; 24 P.S. 2510-3.
[9] Appellees have not attempted to justify the regulations on the basis of the safety of the residents. Appellants are only challenging the absolute nature of the prohibition. The safety argument would fail in light of the existing registration procedure, the control of hours during which such activity may take place, and the fact that canvassing is permitted in other facilities on campus. No showing was made that safety had been impaired in those other residence halls in which canvassing took place. Cf. James v. Nelson, supra.