The PENNSYLVANIA STATE UNIVERSITY, The Milton S. Hershey Medical Center

v.

DERRY TOWNSHIP SCHOOL DISTRICT and The County of Dauphin.

Appeal of COUNTY OF DAUPHIN, Appellant.

The PENNSYLVANIA STATE UNIVERSITY, The Milton S. Hershey Medical Center

v.

DERRY TOWNSHIP SCHOOL DISTRICT and the County of Dauphin.

Appeal of DERRY TOWNSHIP SCHOOL DISTRICT, Appellant.

Commonwealth Court of Pennsylvania.

Argued April 15, 1998.
Decided June 12, 1998.

Kenneth D. Chestek, for appellant, County of Dauphin.

James M. Horne, State College, for appellee, Milton S. Hershey Medical Center.

John W. Beatty, Erie, for appellee, for Derry Tp.

Before COLINS, President Judge, and McGINLEY, SMITH, PELLEGRINI, FRIEDMAN, KELLEY and LEADBETTER, JJ.

FRIEDMAN, Judge.

The County of Dauphin (County) and the Derry Township School District (School District), (collectively, Taxing Authorities), appeal from an order of the Dauphin County Court of Common Pleas (trial court) granting the Pennsylvania State University's (PSU) petition to remove its property, the Milton S. Hershey Medical Center (Hershey), from the real estate tax assessment rolls and striking the tax assessments issued by the Taxing Authorities. We affirm.

PSU is the owner and operator of Hershey, a medical center located in Derry Township, Dauphin County. Hershey encompasses PSU's College of Medicine, its dormitories, various related research facilities and two PSU hospitals.[1] In January of 1993, the Dauphin County Office of Tax Assessment notified PSU that Hershey's exempt status from real estate taxes as a "purely public charity" was invalid as of January 1, 1993 and that, as of that date, its Derry Township properties would be placed on the tax rolls. PSU filed an appeal with

---

1. In 1963, the trustees of the Milton S. Hershey Trust petitioned the Orphan's Court of Dauphin County for approval to transfer $50 million from the Milton Hershey School Trust to the Milton Hershey Foundation (Foundation) to establish and maintain a medical school to be affiliated with and operated by PSU. When the transfer was initially authorized, the Foundation retained ownership of the land and buildings housing the medical complex; however, in 1968, the Foundation transferred all right, title and interest in the Trust funds and assets to PSU, which currently holds title to the real estate involved in this case.

the Dauphin County Board of Assessment Appeals (Board); however, following hearings, the Board denied PSU's appeal and found the Hershey properties taxable. PSU appealed the Board's decision to the trial court which, after a trial *de novo*, reversed the Board. Although the trial court concluded that Hershey was not *exempt* from real estate taxation as a "purely public charity," it held that, in reality, Hershey is PSU which, as an instrumentality of the Commonwealth, is *immune* from taxation.[2]

█ The Taxing Authorities now appeal from the trial court's decision,[3] arguing that PSU is not, in fact, an instrumentality of the Commonwealth or, alternatively, even if PSU enjoys that status, it is not entitled to real estate tax immunity for Hershey under the circumstances here. We now hold that PSU is an instrumentality of the Commonwealth and is thereby immune from local real estate taxation on the Hershey property.

█ Initially, we point to the well-established principle that real estate owned by the Commonwealth may not be subjected to taxation by political subdivisions absent express statutory authority. *Pennsylvania, State Employes' Retirement System v. Dauphin County*, 335 Pa. 177, 6 A.2d 870 (1939); *Bucks County Community College v. Bucks County Bd. of Assessment Appeals*, 147 Pa. Cmwlth. 505, 608 A.2d 622 (1992). We have recognized that, when applicable, such immunity extends not only to property owned by the Commonwealth itself but also to real estate owned by Commonwealth agencies or instrumentalities, whether or not it is used for a public purpose. *Bucks County Community College; Owen J. Roberts School Dist. Appeal,* 45 Pa.Cmwlth. 135, 405 A.2d 1314 (1979), *rev'd on other grounds,* 500 Pa. 465, 457 A.2d 1264 (1983). For example, in *Southeastern Pennsylvania Transp. Auth. v. Bd. of Assessment & Revision of Taxes,* 13 Pa.Cmwlth. 207, 319 A.2d 10 (1974), we held that the Southeastern Pennsylvania Transportation Authority was immune from local taxation as an instrumentality of the Commonwealth. Similar immunity was found for the Redevelopment Authority of the City of Harrisburg in *Harrisburg School Dist. Tax Appeal,* 53 Pa.Cmwlth. 299, 417 A.2d 848 (1980).

█ Here, the Taxing Authorities[4] concede that there is legislation which refers to PSU's status as a state-related university and instrumentality of the Commonwealth. However, the Taxing Authorities maintain that PSU is not considered a state agency or instrumentality for all purposes and, in fact, no court opinion explicitly holds that PSU is an instrumentality of the Commonwealth. In particular, the Taxing Authorities point out that PSU is not considered a state agency within the meaning of the Right to Know

---

2. We have distinguished tax exemption from tax immunity; the former exists where the legislature, in a manner authorized by the constitution, acts affirmatively to remove property otherwise subject to taxation, whereas the latter exists because the legislature never delegated to the taxing body any specific power to tax a particular class of property. *Bucks County Community College v. Bucks County Bd. of Assessment Appeals,* 147 Pa.Cmwlth. 505, 608 A.2d 622 (1992).

Here, the trial court specifically stated that, were it not for PSU's status as an instrumentality of the Commonwealth, at least the hospital portion of Hershey would be subject to real estate taxes. The trial court reasoned that, as a result of acquiring seven for-profit medical practices and its generous salary structure, Hershey did not operate entirely free from a private profit motive and, thus, failed to qualify as a purely public charity under the test set forth in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*). Indeed, the trial court stated that PSU's hospitals operated in the

same fashion as hospitals considered in recent cases in which the courts held that the hospitals' operation of for-profit businesses acted as a bar to their continued tax-exempt status. (*See* Trial ct. op. at 2–4.)

3. Our scope of review in a real estate tax assessment appeal is limited to determining whether the trial court abused its discretion or committed an error of law, and whether the trial court's findings are supported by substantial evidence. *Wilson Area School Dist. v. Easton Hosp.,* 708 A.2d 835 (Pa.Cmwlth. 1998); *Pennsylvania Easter Seal Soc'y Appeal,* 67 Pa.Cmwlth. 94, 445 A.2d 1369 (1982).

4. The County and the School District have each filed a brief in this matter, and although each brief presents the issues and arguments in a slightly different fashion, the substance of both briefs is largely the same. Therefore, we generally refer to arguments as those of the Taxing Authorities in general rather than any specific Appellant, making exceptions where appropriate.

Act,[5] *Roy v. The Pennsylvania State Univ.*, 130 Pa.Cmwlth. 468, 568 A.2d 751 (1990), and, further, that we have refused to consider Temple University, another state-related university which the Taxing Authorities assert is on a par with PSU, to be a Commonwealth agency for purposes of sovereign immunity. *Doughty v. City of Philadelphia*, 141 Pa.Cmwlth. 659, 596 A.2d 1187 (1991). Finally, and most significantly, the Taxing Authorities assert that, when provided with the opportunity to do so, our supreme court declined to recognize PSU as an agency of the Commonwealth for real estate tax immunity purposes. *The Pennsylvania State Univ. v. County of Centre*, 532 Pa. 142, 615 A.2d 303 (1992). Based on these cases, the Taxing Authorities dispute the trial court's determination that PSU is an instrumentality of the Commonwealth for purposes of real estate tax immunity. We cannot agree that these cases support the Taxing Authorities' position.

The County correctly cites *Roy* for the proposition that PSU is not a state agency for purposes of the Right to Know Act; however, as admitted by the Taxing Authorities, an entity's status as a state agency or instrumentality can vary depending on the issue involved. In *Roy*, we examined the definition of agency provided in section 1 of the

Right to Know Act, 65 P.S. §66.1, and concluded that PSU was not a state agency *within the meaning of that act*.[6] Thus, because *Roy* relates to PSU's agency status only in this limited context, that case cannot support the Taxing Authorities' claim that PSU is not an instrumentality of the Commonwealth for purposes of real estate tax immunity. Similarly, because *Doughty* is confined to the issue of sovereign immunity, the Taxing Authorities cannot rely on that case to support their position that PSU is not entitled to immunity for tax purposes.[7] Indeed, we have held tax immunity and sovereign immunity to be separate and distinct concepts. *See Capitol Associates v. School Dist. of the City of Harrisburg*, 684 A.2d 1119 (Pa.Cmwlth.1996) and *Bucks County Community College* (both recognizing that immunity of the sovereign from local taxation stems from the legislature's lack of delegation of the taxing power to the local taxing authority and not from the common-law doctrine of sovereign immunity).

Finally, although it deals indirectly with real estate tax immunity, *County of Centre* does not require this court to conclude that PSU is not a Commonwealth instrumentality.[8] At issue in *County of Centre* was the applicability of the doctrine of issue preclu-

---

5. Act of June 21, 1957, P.L. 390, *as amended*, 65 P.S. §§66.1–66.4, which provides that public records of state agencies shall be open for examination by citizens of Pennsylvania.

6. *Roy* is based on *Mooney v. Temple Univ. Bd. of Trustees*, 4 Pa.Cmwlth. 392, 285 A.2d 909, *aff'd*, 448 Pa. 424, 292 A.2d 395 (1972). In *Mooney*, our supreme court considered the same definition of agency that we examined in *Roy* and held that Temple University, although established as an instrumentality of the Commonwealth to serve as a state-related institution, is not an agency of the Commonwealth whose public records must be made available for public examination. In *Roy*, we likened PSU to Temple, noting that both were declared in statutes to be state-related institutions and instrumentalities of the Commonwealth, and concluded that because their structure was essentially the same, the rationale of *Mooney* applied to *Roy*. We note, however, that while PSU was considered "essentially the same" as Temple University in *Roy*, we have concluded elsewhere that, with respect to PSU's relationship to the state, it is more akin to the wholly state-owned and operated universities in the State System of Higher Education than it is to Temple or the University of Pittsburgh. *Pearson*

*v. Unemployment Comp. Bd. of Review*, 689 A.2d 352 (Pa.Cmwlth.1997).

7. In *Doughty*, Temple University argued that it was a state agency entitled to sovereign immunity based on the Temple University–Commonwealth Act, Act of November 30, 1965, P.L. 843, 24 P.S. §§2510–1 – 2510–12, the statute providing for the establishment and operation of Temple University as an instrumentality of the Commonwealth to serve as a state-related university in the Commonwealth's higher education system. We recognized that Temple fit within the definition of instrumentality, but held that the Commonwealth's use of Temple as an instrumentality did not, in itself, transform Temple into a Commonwealth agency entitled to the defense of sovereign immunity.

8. The Taxing Authorities assert that *County of Centre* compels this determination because, in that case, our supreme court addressed the precise issue we face here and impliedly held that PSU was not a Commonwealth agency for real estate tax purposes.

sion based on a 1939 opinion of the Centre County Court of Common Pleas, which held that Pennsylvania State College, now PSU, was a Commonwealth agency.[9] *Pennsylvania State College v. County of Centre,* (No. 2 Equity November Term, 1937, filed August 24, 1939). Our supreme court concluded that the doctrine of issue preclusion did not apply to determine PSU's status. However, the court did not reach any decision with regard to whether PSU was, in fact, a Commonwealth instrumentality; instead, the court remanded the case for resolution of that issue.[10] We have previously determined that, because *County of Centre* is grounded on the res judicata effect of a 1939 decision, it is not authoritative on the question of whether a state-related university is an instrumentality of the Commonwealth immune from local real estate taxation. *Bucks County Community College.* Because we still believe this to be the case, we must now consider the question of PSU's real estate tax immunity without deriving guidance from *County of Centre.*

To determine whether an entity constitutes an agency or instrumentality of the Commonwealth for tax immunity purposes, appellate courts have examined the language of the entity's enabling legislation. *Buck's County Community College.* PSU's enabling legislation, the Act of February 22, 1855, P.L. 46, *as amended,* 24 P.S. §§2531–2584, is comprised of legislative enactments and related developments which define PSU's fundamental role as an instrumentality of the Commonwealth.[11]

PSU is a state-related institution of higher education created by an act of the General Assembly in 1855, under the name Farmer's High School of Pennsylvania, for the education of youth in the various branches of science, learning and practical agriculture. 24 P.S. §2531. The enabling legislation provided that the Governor, the Secretary of the Commonwealth, the President of the State Agricultural Society and the principal of the institution were to be ex officio members of the Board of Trustees, 24 P.S. §2533; to this day, PSU's Board of Trustees includes six members appointed by the Governor and also has, as ex officio members, the Governor, the Secretary of Education, the Secretary of Agriculture and the Secretary of Environmental Resources. (PSU Exh. 7, R.R. at 430a.) The enabling act also specified in detail the subjects to be taught, requiring the Board of Trustees to employ teachers qualified to impart to pupils a knowledge of the English language, grammar, geography, history, mathematics, chemistry and such other branches of the natural and exact sciences as will conduce to the proper education of a farmer. 24 P.S. §2542. In 1862, the institu-

9. Based on this holding, farmland owned by the College and used for educational purposes was rendered immune from real estate taxation. *Pennsylvania State College.* In 1984, in a case involving taxation of PSU property leased to a third party for commercial purposes, PSU argued that, under the doctrine of issue preclusion, *Pennsylvania State College* was determinative of its status as a Commonwealth agency immune from real estate taxation. The court of common pleas agreed and granted summary judgment, which this court affirmed. However, our supreme court reversed, holding that changes which had occurred in PSU during the intervening years created a lack of identity in the matters involved in the two cases, particularly with regard to the use of the land involved, so that issue preclusion was inapplicable and summary judgment inappropriate. *County of Centre.*

10. This issue was never ultimately addressed because the parties agreed to discontinue the action.

11. PSU's enabling legislation was summarized in *Benner v. Oswald,* 592 F.2d 174 (3rd Cir.), *cert.* denied, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979), which analyzed the various ways in which the state involved itself in PSU's affairs before concluding that all of PSU's actions are "state actions" within the meaning of 42 U.S.C. §1983, stating:

The Court believes it is unquestionable that from the foregoing facts the Commonwealth has direct participation in determining at least some of the members of the Board of Trustees, that the Commonwealth does review [PSU's] expenditure of Commonwealth funds, that the legislature intended [PSU] to be a state educational institution, that the Attorney General of Pennsylvania has consistently regarded [PSU] as such an institution, that [PSU] partakes of benefits available for its capital development, that it relies exclusively upon the general state authority for such development, and that [PSU] is substantially dependent on Commonwealth subsidies. Therefore, the requisite amount of "significant involvement" by the Commonwealth in [PSU's] affairs is present and ... [PSU's] actions are "state actions." *Id.* at 180.

tion was renamed the Agricultural College of Pennsylvania.

Also in 1862, the United States Congress enacted the Morrill Land Grant Act (Morrill Act), 7 U.S.C. §§301–308, providing each state with land to be sold to· support and maintain at least one college in the state that taught both agriculture and mechanical arts, provided that the state agreed to certain terms and conditions. In 1863, pursuant to the Act of April 1, 1863, P.L. 213, 24 P.S. §§2571–2573, 2575 (1863 Act), PSU's relationship to the Commonwealth was more clearly defined when Pennsylvania accepted the provisions of the Morrill Act and directed that funds received through the Morrill Act be paid to the Agricultural College of Pennsylvania, now PSU. Since that time, the Commonwealth annually appropriates money for PSU's support in supplements to the original 1863 Act.[12] (R.R. at 789a–812a). The scope of PSU's responsibilities as a land-grant institution, as well as its relationship to the Commonwealth, further broadened with the enactment of the Smith–Lever Act, 7 U.S.C. §§341–349, and the Hatch Agricultural Experiment Station Act, 7 U.S.C. §§361a-i.[13]

As Pennsylvania's designated land grant institution of higher learning and largest public university, PSU fulfills the responsibilities it has assumed on behalf of the Commonwealth by carrying out educational, research and public service missions for the Commonwealth. In doing so, PSU clearly qualifies as a Commonwealth instrumentality, defined by this court as follows:

we must interpret the phrase 'instrumentality of the Commonwealth' according to its common and approved usage as required by Section 1903 of the Statutory Construction Act of 1972, 1 Pa.C.S. §1903. The definition of 'instrumentality' contained in Webster's Third New International Dictionary[, 1172 (1981) ] is: '1: The quality of being instrumental; 2: something by which an end is achieved; means, b. something that serves as an intermediary or agent through which one or more functions of a controlling force is carried out.' 'Instrumental' is defined by the same dictionary as 'serving as a means or intermediary determining or leading to a particular result; being an instrument that functions in the promotion of some end or purpose.'

*London Grove Township v. Southeastern Chester County Refuse Auth.,* 102 Pa. Cmwlth. 9, 517 A.2d 1002, 1004 (1986).

Based on this definition of instrumentality, we believe that PSU operates as an instrumentality of the Commonwealth, functioning as an integral part of Pennsylvania by carrying out the state's educational, research and public service missions and fulfilling the responsibilities that government has required it to assume. PSU's status as an instrumentality of the Commonwealth has often been recognized by the state legislature,[14] by state

---

**12.** For fiscal year 1994–1995, the appropriation was approximately $256.8 million, (R.R. at 711a), and for fiscal year 1995–1996 the amount of the appropriation increased to approximately $275 million. (Trial ct. op. at 6.) Additionally, the Commonwealth has constructed many of the educational buildings on PSU's campuses, properties valued in the hundreds of millions of dollars. The Commonwealth also provides that any bonds issued by PSU, and loans secured by mortgages, their transfers and the income therefrom, are free from taxation within the Commonwealth. Section 4.1 of the 1863 Act, 24 P.S. §2575.1, added by section 1 of the Act of December 7, 1965, P.L. 1052. In return for this aid, PSU provides lower tuition and fees for students who are residents of Pennsylvania. *Roy.*

**13.** Pursuant to these acts, PSU operates the Cooperative Extension Service through which PSU extends education programs beyond its campus and carries both educational programming and research results out into the larger community. PSU's Cooperative Extension Service maintains offices in each of Pennsylvania's 67 counties. PSU's relationship with the Commonwealth is also reflected in its numerous campuses, extending PSU's educational, cultural and recreational facilities to communities throughout the state.

**14.** For example, in section 4 of the Pennsylvania College of Technology Act, Act of July 1, 1989, P.L. 132, No. 27, 24 P.S. §2510–504, the Pennsylvania College of Technology "is granted the benefits and responsibilities of the status of The Pennsylvania State University as a State-related institution and as an instrumentality of the Commonwealth of Pennsylvania." PSU employees are included within the definition of "State employee" under the State Employees' Retirement Code, 71 Pa.C.S. §5102. Further, in the Public School Employees' Retirement Code, 24 Pa.C.S., §8102, "Employer" is defined as "[a]ny governmental entity directly responsible for the employ-

attorneys general since 1921,[15] and by the federal government;[16] we now add to the long history of such treatment for PSU.

■ Alternatively, the Taxing Authorities contend that, even if PSU is an instrumentality of the Commonwealth, Hershey, or at least the hospital portion of Hershey, still should be held to be taxable. The Taxing Authorities rely on *Delaware County Solid Waste Auth. v. Berks County Bd. of Assessment Appeals*, 534 Pa. 81, 626 A.2d 528 (1993), in which our supreme court held that property owned by a Commonwealth agency is not given blanket immunity, and if an agency acts outside its authorized governmental purposes, its immunity is not automatic. The Taxing Authorities assert that, because Hershey uses the property for a hospital, particularly one operated in competition with private hospitals and physicians in the area, it is acting "in another manner than in a governmental way" and, thus, is not immune from taxation. *See City of Pitts-*

*burgh v. Allegheny County*, 351 Pa. 345, 41 A.2d 639 (1945).

The Taxing Authorities concede that PSU also operates a medical school at Hershey which, arguably, falls within PSU's educational purpose;[17] nevertheless, the Taxing Authorities maintain that the hospitals, which are profit oriented and not required for medical school accreditation, should be segregated from any immune portions of the property and taxed.

On the other hand, PSU contends that all of Hershey's facilities fall within PSU's purpose as necessary to its medical education program and in furtherance of its educational, research and public service mission. In fact, PSU contends that the trial court properly rejected the argument that Hershey operates outside the authorized governmental purpose of a university. We agree. The trial court, relying largely on *Delaware*

ment and payment of the school employee and charged with the responsibility of providing public education within this Commonwealth, including but not limited to:...the Pennsylvania State University." In addition, under the Probate Estate and Fiduciary Code, obligations of Pennsylvania governmental organizations are authorized investments, including obligations of PSU. 20 Pa.C.S. §7305(12).

15. In a 1972 opinion, Pennsylvania's Attorney General held that PSU employees were state employees within the meaning of certain amendments to the Unemployment Compensation Law. Consistent with a 1921 Attorney General opinion, the 1972 opinion noted that, in contrast to private state-aided institutions like Temple University and the University of Pittsburgh, PSU already had been deemed a state instrumentality in much the same way as those entities known as state "authorities." The 1972 opinion also noted that in prior Attorney General rulings, PSU was found immune from gasoline tax and inheritance tax, that bonds of PSU are exempt from Capital Stock Tax and that PSU is a Commonwealth instrumentality for social security purposes. (1972 Op. Atty. Gen. No. 132.) (PSU Exhs. 180–185, R.R. at 813a–21a.) The State Department of Revenue has also declared PSU exempt from the State Sales and Use Tax as an instrumentality of the Commonwealth. (PSU Exh. 186, R.R. at 821a–22a.)

16. In 1949, the Internal Revenue Service ruled that PSU, as an instrumentality of the Commonwealth of Pennsylvania, was not subject to federal income tax. (PSU Exh. 187, R.R. at 823a–

24a.) Interest on debt obligations issued by PSU is similarly exempt from federal income tax. (PSU Exhs. 187, 188, 189, R.R. at 823a–29a.) Moreover, in 1984, Congress determined that, because of the close relationship between PSU and the Commonwealth of Pennsylvania, PSU was to be treated as a state governmental unit for purposes of the tax-exempt bond provision of the Internal Revenue Code. (PSU Exh. 190, R.R. at 830a–33a.)

17. However, the Taxing Authorities contend that there is substantial authority for the conclusion that providing higher education is not a governmental function, citing *Curtis v. Kline*, 542 Pa. 249, 666 A.2d 265 (1995) and *Community College of Philadelphia v. Brown*, 544 Pa. 31, 674 A.2d 670 (1996). These cases do not support the Taxing Authorities' argument.

In *Curtis*, the court notes only that there is no constitutional right to a post-secondary education, so that a statute requiring only separated, divorced or unmarried parents to provide their adult children with such education violated the equal protection clause. In *Brown*, the court concluded that community colleges do not serve "an essential government purpose" within the meaning of the Right to Know Act because education beyond the secondary level is not constitutionally mandated and it is unclear that the services provided by community colleges were indisputably necessary to the continued existence of the Commonwealth. We see no reason why these cases would negate the fact that a medical school fits within the educational purpose of a university.

*County Solid Waste Authority,* reasoned as follows:

> In *Delaware County Solid Waste Authority,* property owned by a municipal authority was used as a land fill. It was undisputed that 296 of the 544 acres of the land fill were not essential parts of the operation of the land fill's disposal area or the required buffer zone. In spite of this fact, the supreme court held that the immunity provision covers property that was acquired or used for an authorized purpose. Since there was no evidence that this excess buffer zone area was acquired or used for a purpose other than as part of the land fill operation, and served no other commercial purpose, it was subject to the same immunity provisions as the remainder of the land fill area. In the instant case, however, the discussion does not revolve around excess land. Here, [PSU] utilizes the six parcels to operate its College of Medicine, clearly within the stated purpose of a university. Additionally, it operates biomedical and animal research facilities which undoubtedly fall under the umbrella of education. Intricately intertwined with the College of Medicine and the research facilities are the [PSU] hospitals, occupying the same land, utilizing many of the same buildings and facilities, administered and staffed by the same state employees and holding themselves out as an integral part of [PSU]. The relationship between the hospitals and the remainder of [Hershey] is more than a mere overlap and akin to the type of "symbiotic relationship" referred to in *Benner v. Oswald,* supra.

(Trial ct. op. at 12–13.)

■ In addition, we agree with PSU's contention that granting immunity from real estate taxes to PSU is consistent with the public policy considerations underlying the concept of such immunity. The immunity rule was "designed to insure the orderly conduct of business and public affairs between and amongst the various governmental agencies in the Commonwealth and to prevent needless, wasteful and time-consuming controversies arising when one agency or political subdivision decides to challenge another." *Moon Area School Dist. v. Garzony,* 522 Pa. 178, 186, 560 A.2d 1361, 1366 (1989). We believe that allowing local taxation of PSU would adversely affect its performance of the governmental business it is expected to conduct. Moreover, because increased Commonwealth appropriations would be required to offset the cost of such taxes, requiring PSU to pay local real estate taxes ultimately would result in the transfer of funds from the Commonwealth to a select number of local taxing bodies.

Accordingly, we affirm.[18]

### ORDER

AND NOW, this 12th day of June, 1998, the order of the Court of Common Pleas of Dauphin County, dated February 7, 1997, is hereby affirmed.

KELLEY, Judge, dissenting.

I respectfully dissent.

As the majority correctly notes, it is a well-established principle that real estate owned by the Commonwealth may not be subjected to taxation by political subdivisions absent express statutory authority. *Bucks County Community College v. Bucks County Board of Assessment Appeals,* 147 Pa. Cmwlth. 505, 608 A.2d 622 (1992). This immunity from taxation exists because the Pennsylvania General Assembly never delegated to the taxing body any specific power to tax Commonwealth property. *Id.* In addition, this immunity from taxation applies not only to property owned by the Commonwealth itself, but also extends to property owned by agencies or instrumentalities of the

---

18. The County raises additional issues regarding PSU's *exemption* from real estate taxation and devotes a large portion of its brief to the argument that PSU is not entitled to an exemption because it is not a purely public charity under the test set forth in *HUP* and does not satisfy the statutory requirements for exemption from real estate taxes under sections 204(a)(3) or 204(a)(7) of the General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. §5020–204(a)(3), 5020–204(a)(7). However, because we have affirmed the trial court's determination that PSU is *immune* from real estate taxation as an instrumentality of the Commonwealth, we need not address these issues.

Commonwealth, whether or not the property is used for a public purpose. *Id.*

Although PSU's Hershey property may be *exempt* from taxation under a charitable exemption under *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985), I strongly disagree with the majority's conclusion that this property is *immune* from taxation because it is the property of an agency or instrumentality of the Commonwealth. Hence, this dissent.

As the majority also correctly notes, in examining whether an entity is an instrumentality or agency of the Commonwealth for tax purposes, we look to the language of the entity's enabling legislation. *Bucks County Community College.* The United States Court of Appeals for the Third Circuit has summarized the enabling legislation that created PSU as follows:

> Penn State was created by statute in 1855, 24 P.S. § 2531, *et seq.*, and was originally known as the Farmers' High School of Pennsylvania. The enabling act provided great detail about the purposes of the school and the subjects to be taught: "the English language, grammar, geography, history, mathematics, chemistry and such other branches of the natural and exact sciences as will conduce to the proper education of a farmer." 24 P.S. § 2542. The statute also established the time and place of the first meeting of the trustees, and directed them to obtain a tract of land and to make improvements thereon for "an institution properly adapted to the instruction of youth in the art of farming...." 24 P.S. § 2541. The statute also set the number of original trustees, specified that the governor, the secretary of the commonwealth, the "principal of the institution", and the president of the state agricultural society shall be ex officio members of the board, and designated the nine other trustees by name. 24 P.S. § 2533. Successors to the original designated trustees were to be elected annually by delegates of each county agricultural society in the commonwealth. 24 P.S. § 2535.
>
> The institution broadened somewhat in 1862 when Congress passed the Morrill Act, which established land grant colleges. 7 U.S.C. § 301 *et seq.* Under the Act, Congress provided land and other assistance for state universities that taught both agriculture and mechanical arts, provided that the state agreed to accept the terms and conditions of the congressional mandate. The commonwealth agreed to those conditions by necessary legislation and expanded the size of the board of trustees by subsequent legislation. Annually, trustees adopt the operating budget and determine the level of tuition to be paid by students in the next academic year. The level of tuition is based on estimates of expense and of income from other sources, including the estimated amount of the state appropriation, endowment income, recovery of indirect costs on government contracts and other miscellaneous sources.

*Benner v. Oswald*, 592 F.2d 174, 177 (3rd Cir.1979).

Thus, PSU was established by statute as a corporation for educational purposes. *Roy v. Pennsylvania State University*, 130 Pa. Cmwlth. 468, 568 A.2d 751 (1990); *Brush v. Pennsylvania State University Board of Trustees*, 249 Pa. Superior Ct. 164, 375 A.2d 810 (1977) (Opinion in support of reversal by Hoffman, J.). However, as this court has previously noted, "[t]he legislature has repeatedly designated Penn State a state-related institution as distinguished from a state-owned or state-aided institution." *Roy*, 568 A.2d at 752 (footnotes omitted). Indeed, as the Pennsylvania Supreme Court has stated:

> [PSU] students now pay tuition, unlike their counterparts in 1939, and state appropriations have decreased as a percentage of total University revenues, resulting in the fact that [PSU]'s principal means of support are no longer state and federal funds but private and federal funds. *In addition, the composition of [PSU's] Board of Directors is no longer public – much less governmental – in nature, and therefore, authority to dispose of University property is not within the purview of the Commonwealth. Appellate courts in this Commonwealth have found these and similar factors to be characteristics of a nonprofit corporation chartered for*

*educational purposes – not an agency of the Commonwealth.*

*Pennsylvania State University v. County of Centre,* 532 Pa. 142, 149–50, 615 A.2d 303, 306–07 (1992) (footnotes omitted and emphasis added). *See also Roy,* 568 A.2d at 753 ("Currently, the Board of Trustees is composed of 32 members only 10 of whom are Commonwealth representatives. The Board of Penn State retains authority over the disposition of the corporation's property, not subject to review by the Commonwealth.").[1]

It is true that an entity's status as an agency or instrumentality of the Commonwealth can vary depending on the circumstances involved. Indeed, as the majority points out, the General Assembly has, on occasion, chosen to grant PSU this status. *See, e.g.,* The Probate and Fiduciary Code, 20 Pa.C.S. § 7305 (Obligations of PSU are included within the obligations of Pennsylvania governmental organizations as authorized investments); Section 4 of the Pennsylvania College of Technology Act, Act of July 1, 1989, P.L. 132, *as amended,* 24 P.S. § 2510–504 (The Pennsylvania College of Technology is granted the status of PSU as a state-related institution and instrumentality of the Commonwealth); The Public School Employees' Retirement Code, 24 Pa.C.S. § 8102 (PSU is included as a governmental entity within the definition of an "Employer"); The State Employees' Retirement Code, 71 Pa.C.S. § 5102 (PSU employees are included within the definition of "State employee").

However, all of the foregoing legislative enactments deal with regulatory or adminis-trative matters; none of them deals with the purchase, sale or tax status of real property. I know of no legislative enactment that authorizes an agency or instrumentality of the Commonwealth to dispose of the property of the Commonwealth without the consent of the Commonwealth. In sum, I believe that the General Assembly has not acted to designate the real property owned by PSU as "Commonwealth property", nor to confer tax immunity status to the property owned by PSU.

Among the reasons supporting its conclusion that PSU is an instrumentality of the Commonwealth for tax immunity purposes, the majority points to the fact that the Commonwealth has constructed many of the educational buildings on PSU's various campuses that are valued in the hundreds of millions of dollars. Indeed, the United States Court of Appeals for the Third Circuit has previously noted:

> [T]he Pennsylvania General State Authority (GSA) has provided physical facilities to [PSU] for many years. [Between] 1968 [and 1979,] the GSA has constructed on the campuses of the University educational buildings valued at approximately 95 million dollars. These improvements were made pursuant to statute, 71 P.S. § 1707.4. The GSA holds legal title to these buildings and to the land upon which they are constructed. In every instance, the University has conveyed title to the land by general warranty deed, and utilizes the GSA buildings in its educational functions and for no other purpose.

---

1. The distinction between the composition of PSU's Board of Trustees and those of the member schools of the Pennsylvania State System of Higher Education (SSHE) is worth noting. As our esteemed colleague Judge J. Sydney Hoffman of the Pennsylvania Superior Court has noted:

   > [As with Temple University,] Pennsylvania State University was similarly established as a corporation for educational purposes. Act of February 22, 1855, P.L. 46 § 1 et seq.; 24 P.S. § 2531 et seq. Section 2 of the Act provides for management and control by a board of trustees which is currently composed of 32 members only ten of whom are public officials. By contrast, the Governor appoints the entire membership of the boards for [the] state colleges [of the SSHE] and Indiana University, specified as departmental administrative

   boards. Act of March 10, 1949, P.L. 30, art. XX, § 2003.1, added 1970, Feb. 17, P.L. 24, No. 13, § 4, eff. July 1, 1969; 24 P.S. § 20–2003.1; Act of March 10, 1949, supra; as amended December 6, 1972, P.L. 1413, No. 306, § 1; 24 P.S. § 20–2008.1. The board of trustees of Pennsylvania State University retains authority over disposition of the property of the corporation not subject to review by the Commonwealth, Act of February 22, 1855, supra; 24 P.S. § 2533; while the boards of the state colleges [of the SSHE] must act with approval of the Commonwealth in managing [the] affairs of those institutions. Act of March 10, 1949, supra; 24 P.S. §§ 20–2003.3, 2008.3. *Brush,* 249 Pa. Superior Ct. at 180, 375 A.2d at 818–19 (Opinion in support of reversal by Hoffman, J.).

*Benner,* 592 F.2d at 178. Thus, when the Commonwealth endeavored to construct facilities on the PSU campuses under the General State Authority Act of 1949 (General State Authority Act),[2] the property on which the facilities were located was conveyed by PSU to the Commonwealth. *Id.*

In 1975, by the Act of July 22, 1975, P.L. 75, the General Assembly amended the Administrative Code of 1929 (Administrative Code)[3] and transferred the powers, functions and duties of the GSA to the Pennsylvania Department of General Services. In 1992, the General Assembly amended section 2401.1 of the Administrative Code that now states, in pertinent part, the following:

> In addition to all other powers and duties set forth in this act, the Department of General Services shall have the power, and its duty shall be:
>
>    *    *    *
>
> (21) To delegate at the discretion of the Secretary of General Services to a State-related institution in the Commonwealth system of higher education the performance on behalf of the Commonwealth of some or all of the powers and duties to plan, design, construct, administer and manage any public improvement project which has been statutorily authorized by the Commonwealth for such institution and the furnishing and equipping thereof, subject to such reasonable, necessary and appropriate conditions as may be mutually agreed upon between the department and such institution.

71 P.S. § 631.1.

In 1992, the General Assembly also amended section 2409–A of the Administrative Code which now reads, in pertinent part, as follows:

> (b) Notwithstanding the provisions of this act, including without limitation this article, or any other act to the contrary, the Department of General Services is authorized to convey, with the approval of the Governor, any project within the meaning of the [General State Authority Act], which was conveyed and transferred by resolution of The General State Authority and under the authority of the act of July 22, 1975 (P.L. 75, No. 45) ... to the Department of General Services, provided that:
>
> (1) The grantee is an institution of higher education located in this Commonwealth.
>
> (2) The project was constructed by The General State Authority on behalf of the grantee.
>
> (3) The consideration for each conveyance shall be based upon either the outstanding principal and interest indebtedness of the project or the total cost of the project adjusted to its present value as determined by the Department of General Services in consultation with the Secretary of the Budget.
>
> (4) All costs of the transaction are borne by the grantee.
>
> (5) No part of the consideration or transaction costs are paid with General Fund moneys or Capital Facilities Fund moneys.
>
> (6) No conveyance shall be made under the authority of this subsection to an institution of the State System of Higher Education.
>
> (c) Notwithstanding the provisions of this act, including, without limitation this article or any other act to the contrary, the Department of General Services is authorized to convey, with the approval of the Governor, to The Pennsylvania State University ... any project which The General State Authority or the Department of General Services constructed on behalf of the grantee, provided that:
>
> (1) All outstanding principal and interest indebtedness of the project has been retired.
>
> (2) All costs of the transaction are borne by the university.
>
> (3) The university shall pay one dollar ($1.00) for each project transferred.

**2.** Act of March 31, 1949, P.L. 372, *as amended,* 71 P.S. §§ 1707.1 – 1707.16.

**3.** Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §§ 51 – 732.

(4) No part of the transaction costs is paid with General Fund moneys or Capital Facilities Fund moneys.

(5) The deed of conveyance shall contain a clause that the property conveyed shall be used for educational purposes by the grantee, and, if at any time the grantee or its successor in function conveys the property or permits the property to be used for any purpose other than those specified in this section, the title to the property shall immediately revert to and revest in the Commonwealth of Pennsylvania.

71 P.S. § 651.9(b), (c).

Based on the foregoing, I believe that the following salient ideas emerge. Under the past and present statutory scheme, the General Assembly has endeavored to aid PSU by authorizing either the GSA or the Department of General Services to construct educational facilities on PSU's various campuses. In order to avail itself of this state aid, the General Assembly has required PSU to convey the property on which these facilities were located to the Commonwealth. Because the Commonwealth held title to these properties, they were immune from taxation by the local authorities. In 1992, under section 2401.1 of the Administrative Code, the General Assembly has authorized the Secretary of the Department of General Services to delegate his authority to PSU to act on the Commonwealth's behalf in the construction and equipping of these facilities.

In addition, under section 2409–A, the General Assembly has authorized the Department of General Services to convey these properties and facilities back to PSU. Where there is an outstanding indebtedness of principal and interest on the project, PSU may purchase these properties and facilities in the amount of this outstanding indebtedness or for the total cost of the project adjusted to its present value. Where there is no outstanding indebtedness, the property may be conveyed to PSU for $1.00, provided that the property and facilities are used solely for educational purposes. When either PSU or its successors in interest do not use the property and facilities exclusively for these purposes, title will immediately revert and revest in the Commonwealth.

The foregoing demonstrates that the General Assembly draws an explicit distinction between that property on the PSU campuses which is owned by the Commonwealth and that which is owned by PSU, and that property on the PSU campuses which is used for educational purposes and that which is not. As a result, I believe that the General Assembly, i.e., the ultimate taxing authority in this Commonwealth, does not consider all of the property on all of the PSU campuses to be immune from taxation as a "Commonwealth property".

Although it is not dispositive in the instant appeal, the recently enacted Institutions of Purely Public Charity Act (Public Charity Act) [4] demonstrates these distinctions. Section 4 of the Public Charity Act states, in pertinent part:

**§ 4. State-related universities**

**(a) General rule.**—It is the intent of the General Assembly to recognize that the State-related universities provide a direct public benefit and serve the public purposes of this Commonwealth by declaring the real property of State-related universities to be public property for purposes of exemption from State and local taxation when the property is actually and regularly used for public purposes ...

**(b) Real property.**—All real property owned by State-related universities, or owned by the Commonwealth and used by a State-related university, is and shall be deemed public property for purposes of the Constitution of Pennsylvania and the laws of this Commonwealth relating to the assessment, taxation and exemption of real estate and shall be exempt from all State and local taxation when actually and regularly used for public purposes.

\*　　\*　　\*

**(d) Definitions.**—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Public purposes." All activities relating to the educational mission of State-related

---

**4.** Act of November 27, 1997, P.L. 508, *as amended,* 10 P.S. §§ 371 – 385.

universities, including teaching, research, service and activities incident or ancillary thereto which provide services to or for students, employees or the public.

"State-related universities." The Pennsylvania State University and its affiliate, the Pennsylvania College of Technology, the University of Pittsburgh, Temple University and its subsidiaries Temple University Hospital, Inc., and Temple University Children's Hospital, Inc., and Lincoln University.

10 P.S. § 374. Thus, under this act, the General Assembly has statutorily exempted from taxation only that property owned by PSU that is related to the educational mission of the university. *Id.*

As a result, I cannot agree with the majority's holding that PSU is an instrumentality of the Commonwealth for tax immunity purposes, and its Hershey property is immune from taxation by the local taxing authorities. In fact, I believe that the General Assembly has gone to great lengths to distinguish between Commonwealth property and property owned by PSU on its various campuses, and has manifested an intention that only that property which is owned by PSU and used for its educational mission should be *exempt* from taxation by the local taxing authorities. Accordingly, I would reverse the order of the Court of Common Pleas of Dauphin County.

SMITH and PELLEGRINI, JJ., join in this dissenting opinion.